**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXANDER GOLDMAN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| BLUE OWL CAPITAL INC., DOUGLAS I. OSTROVER, MARC S. LIPSCHULTZ, and ALAN KIRSHENBAUM, | |
| Defendants. | |

Plaintiff Alexander Goldman ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Blue Owl Capital Inc. ("Blue Owl" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Blue Owl; and (c) review of other publicly available information concerning Blue Owl.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Blue Owl securities between February 6, 2025 and November 16, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Blue Owl is an asset management firm which specializes in alternative investment solutions, primarily private credit (also called "direct lending"). It has three major product platforms: Credit, GP Strategic Capital, and Real Assets. Within Credit, Blue Owl offers direct lending, alternative credit, investment grade credit, liquid credit, and other private financing solutions. As of fiscal 2024, Blue Owl had over $251 billion in assets under its management, 40% of which was part of the Company's Direct Lending business.

3.      Direct lending is when non-banking entities make private loans to businesses. Whereas loans through financial institutions are funded by customer deposits, these loans are funded with money raised from private investors. Investors in private credit funds can then earn income based on the fees and interest payments paid on the portfolio of loans.

4.      Blue Owl's direct lending business manages six business development companies ("BDCs"), including Blue Owl Capital Corporation ("OBDC") and Blue Owl Capital Corporation II ("OBDC II"). An investment in Blue Owl is not, in itself, an investment in any of these BDCs.

5.      OBDC trades on the New York Stock Exchange under the symbol "OBDC." OBDC II is not publicly traded. Because OBDC II is not publicly traded, to ensure investors can access their capital, OBDC II offers quarterly tender offers, where shareholders can sell shares back to the Company at a price equivalent to the fund's current net asset value. OBDC II has consistently made quarterly tender offers for the previous seven years. For comparison, OBDC's share price trades at roughly 80% of the value of its current net assets.

6.      On October 30, 2025, before the market opened, Blue Owl reported financial results for the third quarter of 2025. Blue Owl reported, among other things, new capital commitments reached $14 billion in the third quarter and $57 billion over the 12-month period ending September 30, 2025, and direct lending originations during the quarter were $10.9 billion and during the 12-month period were $46.8 billion. Yet the Company also reported fee-related earnings of only $376.2 million, which missed consensus estimates; fee related earnings margins of 57.1% which missed expectations by roughly 20 basis points; and performance revenue, which fell 33% year over year to only $188,000.

7.      On this news, the Company's share price fell $0.70 per share, or 4.23%, or to close at $15.86 per share on October 30, 2025, on unusually heavy trading volume.

8.      On November 5, 2025, after the market closed, OBDC and OBDC II announced they had entered into a definitive merger agreement and that "***OBDC II does not anticipate***

*conducting additional tender offers prior to the merger.*"[1] The announcement alleged the "proposed merger *enhances liquidity* for shareholders of the combined company." Under the terms of the proposed merger, "shareholders of OBDC II will receive newly issued whole shares of OBDC for each share of OBDC II based on the exchange ratio determined prior to closing." "The exchange ratio will be calculated based upon (i) the NAV [net asset value] per share of OBDC and OBDC II, each determined before merger close and *(ii) the market price of OBDC common stock ('OBDC Price') before merger close.*"

9. On this news, the Company's share price fell $0.74 per share or 4.72%, to close at $14.95 per share on November 6, 2025, on unusually heavy trading volume.

10. On Sunday, November 16, 2025, Financial Times published an article entitled "Blue Owl private credit fund merger leaves some investors facing 20% hit."[2] The article provided an interview with the chief financial officer of OBDC, Jonathan Lamm ("Lamm"), revealing that *"If shareholders were to vote down the deal,* [Lamm] *acknowledged that Blue Owl Capital Corporation II might be forced to limit redemptions."* The article further reported details of two critical aspects of the merger. First, OBDC II investors would indeed be blocked from making any redemptions until the merger completes in 2026. Second, as part of the merger, OBDC II shareholders would see the value of their investments fall by about 20%. Investors in OBDC II would see their investments fall because they would be forced to exchange OBDC II shares for OBDC shares at a rate based on OBDC's market price. But because OBDC shares trades a discount of about 20% to the stated value of its assets, OBDC II shareholders would see the value of their

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

[2] Antoine Gara, *Blue Owl private credit fund merger leaves some investors facing 20% hit: Asset manager blocks redemptions from one of its first private debt vehicles targeting wealthy individuals*, FINANCIAL TIMES (Nov. 16, 2025).

investments reduced by that amount. The article affirmed Lamm "conceded . . . that at current prices, the **investors in Blue Owl Capital Corporation II could take a potential haircut on their investments**." The article continued, "**the trading price of OBDC, Lamm added, had been hit by souring sentiment on private credit markets**[.]"

11.    On this news, the Company's share price fell $0.85 per share, or 5.8%, to close at $13.77 per share on November 17, 2025, on unusually heavy trading volume.

12.    On November 19, 2025, Blue Owl announced the termination of the proposed merger, citing "current market conditions."

13.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Blue Owl was experiencing a meaningful pressure on its asset base from BDC redemptions; (2) that, as a result, the Company was facing undisclosed liquidity issues; (3) that, as a result, the Company would be likely to limit or halt redemptions of certain BDCs; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

14.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

18.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

19.    Plaintiff Alexander Goldman, as set forth in the accompanying certification, incorporated by reference herein, purchased Blue Owl securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.    Defendant Blue Owl is incorporated under the laws of Delaware with its principal executive offices located in New York, New York. Blue Owl's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "OWL."

21.    Defendant Douglas I. Ostrover ("Ostrover") was the Company's Co-Chief Executive Officer ("Co-CEO") at all relevant times.

22.    Defendant Marc S. Lipschultz ("Lipschultz") was the Company's Co-CEO at all relevant times.

23.     Defendant  Alan Kirshenbaum ("Kirshenbaum") was the Company's Chief Financial Officer ("CFO") at all relevant times.

24.     Defendants Ostrover, Lipschultz, and Kirshenbaum (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Blue Owl is an asset management firm which specializes in alternative investment solutions, primarily private credit. It has three major product platforms: Credit, GP Strategic Capital, and Real Assets. Within Credit, Blue Owl offers direct lending, alternative credit, investment grade credit, liquid credit, and other private financing solutions. As of fiscal 2024, the Company had over $251 billion in assets under management, 40% of which was part of the Company's Direct Lending business.

26.     Blue Owl reports certain key financial metrics. Assets under management ("AUM") is the sum of net asset value, debt, uncalled capital commitments, total managed assets for certain credit and real asset products, and par value of collateral for collateralized loan obligations and

other securitizations. Fee-paying AUM ("FPAUM") is the management fees earned and, for BDCs, generally equals the total assets (including assets acquired with debt but excluding cash). "Part I Fees," or management fees, refers to quarterly performance income on the net investment income of BDCs, subject to a fixed hurdle rate. "Part II Fees," or performance revenues, are fees from BDCs that are paid in arrears at the end of each measurement period.

27.     Private credit (or "direct lending") is when non-banking entities make private loans to businesses. Whereas loans through financial institutions are funded by customer deposits, private credit loans are funded by money raised from private investors. Investors in private credit funds can then earn income based on the fees and interest payments paid on the portfolio of loans. Private credit loans are typically made to middle market companies, and often for more high-risk investments.  While a bank would normally be required to ensure investors are protected against the risk of default for a high-risk investment, a private credit fund is not. Private credit firms do not have to build up capital that can absorb losses if a loan defaults, nor even disclose the risk on their books.

28.     There are multiple vehicles for investing in private credit.  Traditional direct private credit fund investments often involve long lock-up periods and large minimum investment requirements. As such, they have historically been the domain of large, institutional investors. Investors can access the private loan market through business development companies ("BDCs"). Unlike private credit funds, BDCs are SEC registered investment vehicles that can be publicly traded and, as a result, they are generally more liquid.

29.     Blue Owl manages a number of BDCs, including OBDC and OBDC II. OBDC trades on the New York Stock Exchange under the symbol "OBDC." OBDC's price fluctuates, but in general, it trades at a value equivalent to roughly 80% of its net asset value.

30.     OBDC II is not publicly traded. To ensure investors can access their capital, OBDC II offers quarterly tender offers, where shareholders can sell shares back to the Company at a price equivalent to the fund's current net asset value. OBDC II has consistently made quarterly tender offers for the previous seven years.

31.     Throughout fiscal year 2025, OBDC II experienced a rapid increase in the number of shares investors repurchased. For example, in the prior year 2024, OBDC II's August-September quarterly redemption saw 3,785,909 shares repurchased.[3] In 2025, OBDC II's August-September quarterly redemption nearly doubled, with 7,138,809 shares repurchased.[4] In total, investors in OBDC II pulled $150 million from the fund through the first nine months of 2025, a 20% increase from this time last year, according to securities filings.[5] Despite this, Defendants misleadingly claimed that there was "no meaningful pressure to our asset base from redemptions," as alleged herein.

**Materially False and Misleading**

**Statements Issued During the Class Period**

32.     The Class Period begins on February 6, 2025. On that day, Blue Owl published financial results for the quarter ended December 31, 2024 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation purported to report the Company's financial results, GAAP historical trends, the performance of

---

[3] *See* Blue Owl Capital Corp. II, Form 10-K Annual Report for the Fiscal Year ended Dec. 31, 2024, filed March 6, 2025, at 80.

[4] *See* Blue Owl Capital Corp. II, Form 10-Q for the fiscal quarter ended Sept. 30, 2025, filed November 5, 2025, at 70.

[5] *Id.*; *see also supra* n.2.

the Company's credit platform, and the Company's liquidity. Specifically the investor presentation stated as follows, in relevant part:

| **Financial Results** | • **GAAP Net Income** of $20.7 million, or $0.03 per basic and $0.03 per diluted Class A Share |
| | • **Fee-Related Earnings** of $340.3 million, or $0.23 per Adjusted Share |
| | • **Distributable Earnings** of $315.2 million, or $0.21 per Adjusted Share |

| **Capital Metrics** | • **AUM** of $251.1 billion, up 52% since December 31, 2023 |
| | ◦ **FPAUM** of $159.8 billion, up 56% since December 31, 2023 |
| | ◦ **Permanent Capital** of $191.5 billion, up 47% since December 31, 2023 |
| | ◦ **AUM Not Yet Paying Fees** of $22.6 billion, reflecting expected annual management fees of over $300 million once deployed |
| | • **New Capital Commitments Raised** of $18.1 billion ($9.5 billion new equity capital) in the quarter |
| | • **FPAUM Raised and Deployed** of $9.2 billion in the quarter |

      \*          \*          \*

## Historical Trends (GAAP)

- **GAAP Management Fees** of $1,994.1 million for the year, increased 31% compared to prior year
- **GAAP Consolidated Net Income** of $420.4 million for the year, compared to $220.8 million in the prior year
- **GAAP Net Income Attributable to Class A Shares** of $109.6 million for the year, compared to $54.3 million in the prior year

      \*          \*          \*

## Credit Platform

- **AUM** of $135.7 billion, increased 60% since December 31, 2023
  - ◦ The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised and change in debt in products from the direct lending strategy.
- **FPAUM** of $91.0 billion, increased 59% since December 31, 2023
  - ◦ The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy and deployment across the platform
- **Direct Originations** during the quarter were $13.4 billion with net deployment of $2.1 billion
  - ◦ Direct Originations for the year were $52.0 billion with net deployment of $16.6 billion
- **AUM Not Yet Paying Fees** totaled $16.4 billion, reflecting expected annual management fees of $238 million once deployed
- **Direct Lending Gross Returns**[1] of 3.1% for 4Q'24 and 13.9% for 2024

      \*          \*          \*



33.    On February 21, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results and reported financial metrics for each of the BDCs.  Specifically, the FY24 10-K states, in relevant part:

*Credit*

| (dollars in millions) | Year of Inception | AUM | Capital Raised (4) | Invested Capital (5) | Realized Proceeds (6) | Unrealized Value (7) | Total Value | MoIC Gross (8) | MoIC Net (9) | IRR Gross (10) | IRR Net (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Lending** | | | | | | | | | | | |
| Blue Owl Capital Corporation (1) | 2016 | $ 15,625 | $ 5,977 | $ 5,977 | $ 3,536 | $ 5,972 | $ 9,508 | 1.84x | 1.59x | 13.7 % | 9.8 % |
| Blue Owl Capital Corporation II (1)(2) | 2017 | $ 2,522 | $ 1,206 | $ 1,176 | $ 530 | $ 1,153 | $ 1,683 | NM | 1.43x | NM | 7.4 % |
| Blue Owl Capital Corporation III (1) | 2020 | $ 4,812 | $ 1,845 | $ 1,842 | $ 606 | $ 1,909 | $ 2,515 | 1.43x | 1.37x | 13.9 % | 12.0 % |
| Blue Owl Credit Income Corp. (1)(2) | 2020 | $ 28,636 | $ 13,944 | $ 12,907 | $ 1,872 | $ 13,205 | $ 15,077 | NM | 1.17x | NM | 11.2 % |
| Blue Owl Technology Finance Corp. (1) | 2018 | $ 7,403 | $ 3,372 | $ 3,372 | $ 970 | $ 3,608 | $ 4,578 | 1.45x | 1.36x | 11.8 % | 9.1 % |
| Blue Owl Technology Finance Corp. II (1) | 2021 | $ 8,207 | $ 4,178 | $ 2,623 | $ 303 | $ 2,736 | $ 3,039 | 1.22x | 1.16x | 16.5 % | 11.7 % |
| Blue Owl Technology Income Corp. (1)(2) | 2022 | $ 6,071 | $ 3,131 | $ 2,840 | $ 357 | $ 2,904 | $ 3,261 | NM | 1.15x | NM | 11.6 % |
| Blue Owl First Lien Fund Levered (3) | 2018 | $ 1,419 | $ 986 | $ 912 | $ 590 | $ 647 | $ 1,237 | 1.44x | 1.36x | 10.2 % | 8.3 % |
| Blue Owl First Lien Fund Unlevered (3) | 2019 | $ 68 | $ 175 | $ 156 | $ 122 | $ 68 | $ 190 | 1.27x | 1.22x | 6.4 % | 5.2 % |

34.    The FY24 10-K also reported AUM, Part I Fees, and Part II Fees. Specifically, the FY24 10-K states, in relevant part:

*Year Ended December 31, 2024, Compared to the Year Ended December 31, 2023*

| (dollars in thousands) | Year Ended December 31, | | $ Change |
| --- | --- | --- | --- |
| | 2024 | 2023 | |
| **Revenues** | | | |
| Management fees, net (includes Part I Fees of $527,859 and $387,346) | $ 1,994,064 | $ 1,527,241 | $ 466,823 |
| Administrative, transaction and other fees | 294,267 | 200,746 | 93,521 |
| Performance revenues | 7,096 | 3,621 | 3,475 |
| **Total Revenues, Net** | **2,295,427** | **1,731,608** | **563,819** |
| **Expenses** | | | |
| Compensation and benefits | 1,017,483 | 870,642 | 146,841 |
| Amortization of intangible assets | 258,256 | 300,341 | (42,085) |
| General, administrative and other expenses | 412,931 | 242,809 | 170,122 |
| **Total Expenses** | **1,688,670** | **1,413,792** | **274,878** |
| **Other Loss** | | | |
| Net gains (losses) on investments | 1,713 | 4,203 | (2,490) |
| Interest and dividend income | 42,172 | 22,176 | 19,996 |
| Interest expense | (121,894) | (75,696) | (46,198) |
| Change in TRA liability | 7,080 | (1,656) | 8,736 |
| Change in warrant liability | (38,300) | (14,050) | (24,250) |
| Change in earnout liability | (28,300) | (6,409) | (21,891) |
| **Total Other Loss** | **(137,529)** | **(71,432)** | **(66,097)** |
| **Income Before Income Taxes** | **469,228** | **246,384** | **222,844** |
| Income tax expense | 48,782 | 25,608 | 23,174 |
| **Consolidated Net Income** | **420,446** | **220,776** | **199,670** |
| Net income attributable to noncontrolling interests | (310,862) | (166,433) | (144,429) |
| **Net Income Attributable to Blue Owl Capital Inc.** | $ 109,584 | $ 54,343 | $ 55,241 |

\*                    \*                    \*

*Assets Under Management*



35.    The FY24 10-K went on to describe the alleged factors impacting the Company's business environment, including that the Company saw "***no meaningful pressure to our asset base***

*from redemptions*" and "*ended the fourth quarter of 2024 with substantial available capital to deploy, reporting approximately $22.6 billion of AUM not yet paying fees.*" Specifically, the FY24 10-K states, in relevant part:

> **Business Environment**
>
> Our business is impacted by conditions in the financial markets and economic conditions in the United States, and to a lesser extent, globally.
>
> We believe that our management-fee centric business model and base of Permanent Capital contribute to the resiliency of our earnings and the strength of our business growth, particularly during periods of market uncertainty and volatility, as we have seen over the past few years. During the fourth quarter of 2024, industry M&A and capital markets activity remained moderately constructive, a continuation of the improvement relative to late 2022 and early 2023.
>
> Over the past twelve months, 91% of our GAAP and FRE management fees were generated by Permanent Capital and the remainder was predominantly from long-dated capital, with **no meaningful pressure to our asset base from redemptions.** The fourth quarter of 2024 was a record fundraising quarter for Blue Owl, in which we raised $9.5 billion of equity across an increasingly diversified set of products and strategies. Inclusive of debt, we raised $18.1 billion of capital in the fourth quarter and $47.5 billion in 2024. Fundraising and capital deployment contributed to management fee growth of over 25% compared with the prior year. We ended the fourth quarter of 2024 with substantial available capital to deploy, reporting approximately $22.6 billion of AUM not yet paying fees.

36.    The FY24 10-K purported to warn of risks which "*could*" or "*may*" impact the Company negatively, including that BDC fees "*comprise a substantial majority of our revenues*" and the Company is "*vulnerable to an increased number of investors seeking to participate in share redemption programs or tender offers of our non-traded products.*" Specifically, the FY24 10-K states, in relevant part:

> **Management fees and other fees comprise a substantial majority of our revenues and a reduction in such fees could have an adverse effect on our results of operations and the level of cash available for distributions to our stockholders.**
>
> *BDCs*
>
> The investment advisory and management agreements we have with each of our BDCs categorize the fees we receive as: (a) base management fees, which are paid

quarterly and generally increase or decrease based on the average fair value of our BDC's gross assets (excluding cash and cash equivalents) or average fair value of gross assets (excluding cash) plus undrawn commitments, (b) Part I Fees and (c) Part II Fees. *If any of our BDCs' gross assets or net investment income (before Part I Fees and Part II Fees) were to decline significantly for any reason, including, without limitation, due to fair value accounting requirements, the poor performance of its investments or the inability or increased cost to obtain or maintain borrowings for each of our BDCs, the amount of the fees we receive from our BDCs, including the base management fee and the Part I Fees, would also decline significantly, which could have an adverse effect on our revenues and results of operations.* Our investment advisory and management agreements typically provide that the rates at which we earn advisory fees from certain of our BDCs increase after such BDCs are publicly listed (where before the listing the advisory fees typically are a reduced base management fee with a reduced or no Part I or II Fees). If these BDCs do not become publicly listed on anticipated timeframes or at all for any reason, including the NAV performance of our BDCs, Blue Owl will not benefit from this increase, and those BDCs may need to return their capital to investors, further reducing our management fees.

*                              *                              *

***We are vulnerable to an increased number of investors seeking to participate in share redemption programs or tender offers of our non-traded products.***

In recent periods we have launched a number of non-traded products, including BDCs and REITs. Non-traded products often conduct share redemption programs or tender offers to provide liquidity to investors in such vehicles. While such share redemption programs and tender offers may contain restrictions that limit the amount of shares that may be redeemed or purchased in particular periods, an increase in the number of investors requesting redemptions or participating in tender offers, or an increase in the amount of shares redeemed or purchased through such redemption programs or tender offers, of our non-traded products could lead to a decline in the management fees and incentive fees we receive. Economic events affecting the U.S. economy, such as volatility in the financial markets, inflation, fluctuations in interest rates or global or national events that are beyond our control, could cause investors to request redemption of an increased number of shares pursuant to the share redemption programs of our non-traded products, potentially in excess of established limits. Such prolonged economic disruptions have caused a number of similar products to deny redemption requests or to suspend or partially suspend their share

37.    The  FY24 10-K concluded that, "[b]ased on management's experience and [the]

current level of liquidity and assets under management" the Company's "***current liquidity position***

***and cash generated from management fees will continue to be sufficient***" to meet anticipated needs. Specifically, the FY24 10-K states, in relevant part:

**Liquidity and Capital Resources**

*Overview*

We rely on management fees as the primary source of our operating liquidity. From time to time we may rely on the use of our Revolving Credit Facility between management fee collection dates, which generally occur on a quarterly basis. We may also rely on our Revolving Credit Facility for liquidity needed to fund acquisitions, which we may replace with longer-term financing, subject to market conditions.

We ended the fourth quarter of 2024 with $152.1 million of cash and cash equivalents and approximately $1.6 billion available under our Revolving Credit Facility. Based on management's experience and our current level of liquidity and assets under management, we believe that our current liquidity position and cash generated from management fees will continue to be sufficient to meet our anticipated working capital needs for at least the next 12 months.

38.    On May 1, 2025, Blue Owl reported its financial results for the quarter ended March 31, 2025 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation purported to report the Company's financial results, GAAP historical trends, the performance of the Company's credit platform, and the Company's liquidity. Specifically the investor presentation stated as follows, in relevant part:

**Financial Results**
- **GAAP Net Income** of $7.4 million, or $0.01 per basic and $0.00 per diluted Class A Share
- **Fee-Related Earnings** of $345.4 million, or $0.22 per Adjusted Share
- **Distributable Earnings** of $262.5 million, or $0.17 per Adjusted Share

**Capital Metrics**
- **AUM** of $273.3 billion, up 57% since March 31, 2024
  - **FPAUM** of $174.6 billion, up 66% since March 31, 2024
  - **Permanent Capital** of $196.1 billion, up 42% since March 31, 2024
  - **AUM Not Yet Paying Fees** of $23.4 billion, reflecting expected annual management fees of $289 million once deployed
- **New Capital Commitments Raised** of $10.7 billion ($6.7 billion new equity capital) in the quarter
- **FPAUM Raised and Deployed** of $5.7 billion in the quarter

*    *    *

# Historical Trends (GAAP)

- **GAAP Management Fees** of $2,150.4 million for the last twelve months, increased 33% compared to prior year
- **GAAP Consolidated Net Income** of $345.1 million for the last twelve months, compared to $290.8 million in the prior year
- **GAAP Net Income Attributable to Class A Shares** of $91.9 million for the last twelve months, compared to $71.1 million in the prior year

*    *    *

# Credit Platform

- **AUM** of $139.2 billion, increased 53% since March 31, 2024
    - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy
- **FPAUM** of $92.9 billion, increased 58% since March 31, 2024
    - The increase was primarily driven by the Kuvare and Atalaya Acquisitions, as well as capital raised in products from the direct lending strategy and deployment across the platform
- **Direct Lending Originations** during the quarter were $12.8 billion with net deployment of $4.5 billion
    - Direct Lending Originations for the last twelve months were $55.8 billion with net deployment of $18.2 billion
- **AUM Not Yet Paying Fees** totaled $16.7 billion, reflecting expected annual management fees of $228 million once deployed
- **Direct Lending Gross Returns**[1] of 3.1% for 1Q'25 and 13.3% over the last twelve months ended 1Q'25
- **Alternative Credit Gross Returns**[1] of 6.1% for 1Q'25 and 15.2% over the last twelve months ended 1Q'25

*    *    *

# Supplemental Liquidity Metrics

As of March 31, 2025, the average maturity of the Company's outstanding notes is ~10 years.



**Total Debt ($M)**

- $3,240
- $730
- $60
- $350
- $400
- $700
- $1,000

Legend:
- Revolving Credit Facility
- 2028 Unsecured Notes
- 2051 Unsecured Notes
- 2032 Unsecured Notes
- 2031 Unsecured Notes
- 2034 Unsecured Notes

**Available Liquidity ($M)**

- $98
- $985

Legend:
- Revolving Credit Facility
- Cash and Cash Equivalents

**Credit Ratings**

BBB+ Baa2
Fitch  Moody's

BBB
S&P

$1.1B
Available Liquidity

3.8%
Cost of Debt[1]

39.     On May 5, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results and reporting additional financial results, including the alleged performance of the Company's BDCs in general, and OBDC and OBDC II in particular. The quarterly report further stated the alleged factors impacting the Company's business environment, including that there was "***with no meaningful pressure on our asset base from redemptions***." Finally, the quarterly report asserted "[b]ased on management's experience and [the] current level of liquidity and assets under management" the Company's "***current liquidity position and cash generated from management fees will continue to be sufficient***" to meet anticipated needs. Specifically, the quarterly report stated as follows, in relevant part:

> ***Over the past twelve months, approximately 88% and 89% of our GAAP and FRE management fees,*** respectively, were generated by Permanent Capital and the remainder was predominantly from long-dated capital, ***with no meaningful pressure on our asset base from redemptions.*** We raised $10.7 billion of capital during the first quarter of 2025, with $6.7 billion of equity capital raised, resulting in $48.6 billion of total capital raised during the last twelve months, with $29.4 billion of equity capital raised. Fundraising and capital deployment contributed to management fee growth of over 30% over the last twelve months, compared with the corresponding period. We ended the first quarter of 2025 with substantial available capital to deploy, reporting approximately $23.4 billion of AUM not yet paying fees.

*          *          *

**Credit**

| (dollars in millions) | Year of Inception | AUM | Capital Raised (6) | Invested Capital (7) | Realized Proceeds (8) | Unrealized Value (9) | Total Value | MoIC Gross (10) | MoIC Net (11) | IRR Gross (12) | IRR Net (13) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Lending** | | | | | | | | | | | |
| Blue Owl Capital Corporation (1)(2) | 2016 | $ 16,375 | $ 5,977 | $ 5,977 | $ 3,700 | $ 5,953 | $ 9,653 | 1.87x | 1.61x | 13.7 % | 9.8 % |
| Blue Owl Capital Corporation III (1)(2) | 2020 | $ 5,056 | $ 1,845 | $ 1,842 | $ 720 | $ 1,839 | $ 2,559 | 1.46x | 1.39x | 14.0 % | 11.9 % |
| Blue Owl Credit Income Corp. (1)(3) | 2020 | $ 32,303 | $ 15,448 | $ 14,218 | $ 2,223 | $ 14,522 | $ 16,745 | NM | 1.18x | NM | 11.1 % |
| Blue Owl Technology Finance Corp. (1)(4) | 2018 | $ 7,588 | $ 3,392 | $ 3,392 | $ 1,047 | $ 3,595 | $ 4,642 | 1.49x | 1.37x | 12.1 % | 8.9 % |
| Blue Owl Technology Finance Corp. II (1)(4) | 2021 | $ 8,665 | $ 4,184 | $ 2,880 | $ 397 | $ 2,971 | $ 3,368 | 1.23x | 1.17x | 16.1 % | 11.5 % |
| **Alternative Credit** | | | | | | | | | | | |
| Blue Owl Asset Special Opportunities Fund VIII (5) | 2021 | $ 1,841 | $ 1,849 | $ 1,728 | $ 296 | $ 2,050 | $ 2,346 | 1.38x | 1.36 x | 21.6 % | 16.4 % |
| | | * | | | | * | | * | | | |

*Three Months Ended March 31, 2025, Compared to the Three Months Ended March 31, 2024*

|  | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| (dollars in thousands) | 2025 | 2024 | $ Change |
| **Revenues** | | | |
| Management fees, net (includes Part I Fees of $132,556 and $120,161) | $    604,186 | $    447,898 | $    156,288 |
| Administrative, transaction and other fees | 72,988 | 63,397 | 9,591 |
| Performance revenues | 6,312 | 2,045 | 4,267 |
| **Total Revenues, Net** | **683,486** | **513,340** | **170,146** |
| **Expenses** | | | |
| Compensation and benefits | 325,940 | 224,791 | 101,149 |
| Amortization of intangible assets | 89,473 | 56,195 | 33,278 |
| General, administrative and other expenses | 190,779 | 76,748 | 114,031 |
| **Total Expenses** | **606,192** | **357,734** | **248,458** |
| **Other Loss** | | | |
| Net gains (losses) on investments | (7,700) | 3,173 | (10,873) |
| Interest and dividend income | 11,230 | 4,755 | 6,475 |
| Interest expense | (38,524) | (22,484) | (16,040) |
| Change in TRA liability | (4,276) | 1,019 | (5,295) |
| Change in warrant liability | — | (14,700) | 14,700 |
| Change in earnout liability | 2,318 | (585) | 2,903 |
| **Total Other Loss** | **(36,952)** | **(28,822)** | **(8,130)** |
| **Income Before Income Taxes** | **40,342** | **126,784** | **(86,442)** |
| Income tax expense | 3,672 | 14,771 | (11,099) |
| **Consolidated Net Income** | **36,670** | **112,013** | **(75,343)** |
| Net income attributable to noncontrolling interests | (29,240) | (86,922) | 57,682 |
| **Net Income Attributable to Blue Owl Capital Inc.** | **$    7,430** | **$    25,091** | **$    (17,661)** |

\*                              \*                              \*

## Liquidity and Capital Resources

### *Overview*

We rely on management fees as the primary source of our operating liquidity. From time to time we may rely on the use of our Revolving Credit Facility (as defined in Note 7 to our Financial Statements) between management fee collection dates, which generally occur on a quarterly basis. We may also rely on our Revolving Credit Facility for liquidity needed to fund acquisitions, which we may replace with longer-term financing, subject to market conditions.

We ended the first quarter of 2025 with $97.6 million of cash and cash equivalents and approximately $1.0 billion available under our Revolving Credit Facility. ***Based on management's experience and our current level of liquidity and assets***

*under management, we believe that our current liquidity position and cash generated from management fees will continue to be sufficient to meet our anticipated working capital needs for at least the next 12 months.*

40.     On July 31, 2025, Blue Owl reported its financial results for the quarter ended June 30, 2025 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation purported to report the Company's financial results, GAAP historical trends, the performance of the Company's credit platform, and the Company's liquidity. Specifically the investor presentation stated as follows, in relevant part:

| **Financial Results** | • **GAAP Net Income** of $17.4 million, or $0.03 per basic and $0.02 per diluted Class A Share<br>• **Fee-Related Earnings** of $358.3 million, or $0.23 per Adjusted Share<br>• **Distributable Earnings** of $323.0 million, or $0.21 per Adjusted Share |
|---|---|
| **Capital Metrics** | • **AUM** of $284.1 billion, up 48% since June 30, 2024<br>   ◦ **FPAUM** of $177.5 billion, up 46% since June 30, 2024<br>   ◦ **Permanent Capital** of $204.6 billion, up 41% since June 30, 2024<br>   ◦ **AUM Not Yet Paying Fees** of $28.6 billion, reflecting expected annual management fees of approximately $379 million once deployed<br>• **New Capital Commitments Raised** of $13.9 billion ($12.1 billion new equity capital) in the quarter<br>• **FPAUM Raised and Deployed** of $5.4 billion in the quarter |

\*                              \*                              \*

## Historical Trends (GAAP)

• **GAAP Management Fees** of $2,308.0 million for the last twelve months, increased 35% compared to prior year
• **GAAP Consolidated Net Income** of $277.7 million for the last twelve months, compared to $394.8 million in the prior year
• **GAAP Net Income Attributable to Class A Shares** of $75.4 million for the last twelve months, compared to $92.2 million in the prior year

\*                              \*                              \*

41.     On August 1, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results and reporting additional purported financial results, including the performance of the Company's BDCs in general, and OBDC and OBDC II in particular. The quarterly report further

stated the alleged factors impacting the Company's business environment, including that there was "***with no meaningful pressure on our asset base from redemptions.***" Finally, the quarterly report asserted "[b]ased on management's experience and [the] current level of liquidity and assets under management" the Company's "current liquidity position and cash generated from management fees will continue to be sufficient" to meet anticipated needs. Specifically, the quarterly report stated as follows, in relevant part:

> Over the past twelve months, approximately 86% and 87% of our GAAP and FRE management fees, respectively, were generated by Permanent Capital and the remainder was predominantly from long-dated capital, ***with no meaningful pressure on our asset base from redemptions.*** We had a record fundraising quarter, bringing in $13.9 billion of new capital commitments during the second quarter of 2025, resulting in $54.6 billion of total capital raised during the last twelve months. Fundraising, capital deployment, and acquisitions contributed to management fee growth of over 30% over the last twelve months, compared with the prior corresponding period. We ended the second quarter of 2025 with substantial available capital to deploy, reporting approximately $28.6 billion of AUM not yet paying fees.
>
> During the second quarter of 2025, industry M&A and capital markets activity remained relatively lackluster, further shining a spotlight on the importance of scale and incumbency in generating deployment opportunities during more challenged market landscapes. While the market volatility in April and subsequent pause of capital markets did not extend into the back half of the second quarter, we believe it pushed out further the return of significant M&A activity, extending pipelines across the industry.
>
> Despite these dynamics, the second quarter of 2025 was moderately active for direct lending deployment, with $9.7 billion of originations, bringing our last twelve month gross deployment to $46.9 billion and net funded deployment to $13.5 billion. Much like in direct lending, we saw cross-platform network effects benefiting our alternative credit and investment grade credit strategies, demonstrating the expanding role that private lenders are being asked to play in the broader credit markets. In alternative credit, we renewed and upsized a forward flow agreement with a large consumer lending platform and upsized a transaction with a U.K.-based lender that funds both U.S. and U.K. small businesses.

*         *         *

***Credit***

| (dollars in millions) | Year of Inception | AUM | Capital Raised (6) | Invested Capital (7) | Realized Proceeds (8) | Unrealized Value (9) | Total Value | MoIC | | IRR | |
| | | | | | | | | Gross (10) | Net (11) | Gross (12) | Net (13) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Lending** | | | | | | | | | | | |
| Blue Owl Capital Corporation (1)(2) | 2016 | $ 21,497 | $ 7,736 | $ 7,736 | $ 3,915 | $ 7,739 | $ 11,654 | 1.70x | 1.51x | 13.6% | 9.9% |
| Blue Owl Credit Income Corp. (1)(3) | 2020 | $ 34,237 | $ 17,540 | $ 16,106 | $ 2,614 | $ 16,270 | $ 18,884 | NM | 1.17x | NM | 10.6% |
| Blue Owl Technology Finance Corp. (1)(4) | 2018 | $ 16,543 | $ 7,707 | $ 7,707 | $ 1,121 | $ 7,947 | $ 9,068 | 1.23x | 1.18x | 12.0% | 9.0% |
| **Alternative Credit** | | | | | | | | | | | |
| Blue Owl Asset Special Opportunities Fund VIII (5) | 2021 | $ 1,765 | $ 1,849 | $ 1,711 | $ 415 | $ 1,928 | $ 2,343 | 1.41x | 1.37 x | 20.1% | 15.2% |

\*                          \*                          \*

| (dollars in thousands) | Three Months Ended June 30, | | |
| | 2025 | 2024 | $ Change |
|---|---|---|---|
| **Revenues** | | | |
| Management fees, net (includes Part I Fees of $137,965 and $129,442) | $ 623,369 | $ 465,754 | $ 157,615 |
| Administrative, transaction and other fees | 78,758 | 83,906 | (5,148) |
| Performance revenues | 979 | 188 | 791 |
| **Total Revenues, Net** | **703,106** | **549,848** | **153,258** |
| **Expenses** | | | |
| Compensation and benefits | 326,300 | 227,103 | 99,197 |
| Amortization of intangible assets | 89,472 | 56,734 | 32,738 |
| General, administrative and other expenses | 188,052 | 93,458 | 94,594 |
| **Total Expenses** | **603,824** | **377,295** | **226,529** |
| **Other Loss** | | | |
| Net gains (losses) on investments | (2,420) | 2,624 | (5,044) |
| Interest and dividend income | 11,015 | 13,787 | (2,772) |
| Interest expense | (41,986) | (32,715) | (9,271) |
| Change in TRA liability | (2,026) | (2,978) | 952 |
| Change in warrant liability | — | 3,050 | (3,050) |
| Change in earnout liability | 20,629 | (70) | 20,699 |
| **Total Other Loss** | **(14,788)** | **(16,302)** | **1,514** |
| **Income Before Income Taxes** | **84,494** | **156,251** | **(71,757)** |
| Income tax expense | 13,798 | 18,197 | (4,399) |
| **Consolidated Net Income** | **70,696** | **138,054** | **(67,358)** |
| Net income attributable to noncontrolling interests | (53,270) | (104,109) | 50,839 |
| **Net Income Attributable to Blue Owl Capital Inc.** | **$ 17,426** | **$ 33,945** | **$ (16,519)** |

\*                          \*                          \*

## Liquidity and Capital Resources

### Overview

We rely on management fees as the primary source of our operating liquidity. From time to time we may rely on the use of our Revolving Credit Facility between management fee collection dates, which generally occur on a quarterly basis. We

23

may also rely on our Revolving Credit Facility for liquidity needed to fund acquisitions, which we may replace with longer-term financing, subject to market conditions.

We ended the second quarter of 2025 with $117.6 million of cash and cash equivalents and approximately $0.9 billion available under our Revolving Credit Facility. ***Based on management's experience and our current level of liquidity and assets under management, we believe that our current liquidity position and cash generated from management fees will continue to be sufficient to meet our anticipated working capital needs for at least the next 12 months.***

42.    The above statements identified in ¶¶32-41 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Blue Owl was experiencing a meaningful pressure on its asset base from BDC redemptions; (2) that, as a result, the Company was facing undisclosed liquidity issues; (3) that, as a result, the Company would be likely to limit or halt redemptions of certain BDCs; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

43.    On October 30, 2025, before the market opened, Blue Owl reported financial results for the third quarter of 2025. The Company reported, among other things, new capital commitments reached $14 billion in the third quarter and $57 billion over the last twelve months, and direct lending originations during the quarter were $10.9 billion and $46.8 billion over the last twelve months. Yet the Company reported fee-related earnings of only $376.2 million, which missed consensus estimates; fee-related earnings margins of 57.1% which missed expectations by roughly 20 basis points; and performance revenue which fell 33% year over year to only $188,000. Specifically, on that date, Blue Owl reported its financial results for the quarter ended September

30, 2025 in an investor presentation, simultaneously published with the SEC on a Form 8-K as Exhibit 99.2. The investor presentation stated as follows, in relevant part:

| Financial Results | |
|---|---|
| | • **GAAP Net Income** of $6.3 million, or $0.01 per basic and $0.01 per diluted Class A Share |
| | • **Fee-Related Earnings** of $376.2 million, or $0.24 per Adjusted Share |
| | • **Distributable Earnings** of $341.0 million, or $0.22 per Adjusted Share |

| Capital Metrics | |
|---|---|
| | • **AUM** of $295.6 billion, up 26% since September 30, 2024 |
| | ◦ **FPAUM** of $183.8 billion, up 19% since September 30, 2024 |
| | ◦ **Permanent Capital** of $213.8 billion, up 19% since September 30, 2024 |
| | ◦ **AUM Not Yet Paying Fees** of $28.4 billion, reflecting expected annual management fees of approximately $361 million once deployed |
| | • **New Capital Commitments Raised** of $14.4 billion ($11.2 billion new equity capital) in the quarter |
| | • **FPAUM Raised and Deployed** of $11.0 billion in the quarter |

\*                              \*                              \*

## Fundraising

- **New Capital Commitments Raised** of $14.4 billion in the quarter
  - New Capital Commitments Raised of $57.0 billion during the last twelve months
- **Total Equity Fundraise** of $11.2 billion during the quarter was driven by $5.6 billion in Credit, $3.0 billion in Real Assets and $2.7 billion in GP Strategic Capital
- **Private Wealth Equity Fundraise** of $4.2 billion during the quarter was primarily driven by products from the direct lending and alternative credit strategies in Credit and products from the net lease strategy in Real Assets
  - Private Wealth Equity Fundraise of $16.2 billion during the last twelve months
- **Institutional Equity Fundraise** of $7.0 billion during the quarter was primarily driven by products from the direct lending and investment grade credit strategies in Credit, products from the GP minority stakes strategy in GP Strategic Capital, and products from the net lease strategy in Real Assets
  - Institutional Equity Fundraise of $23.3 billion during the last twelve months

\*                              \*                              \*

## Credit Platform

- **AUM** of $152.1 billion, increased 18% since September 30, 2024
  - The increase was primarily driven by capital raised in products from the direct lending strategy
- **FPAUM** of $97.3 billion, increased 9% since September 30, 2024
  - The increase was primarily driven by capital raised in products from the direct lending strategy and deployment across the platform, partially offset by distributions in the direct lending strategy
- **Direct Lending Originations** during the quarter were $10.9 billion with net deployment of $2.9 billion
  - Direct Lending Originations for the last twelve months were $46.8 billion with net deployment of $12.1 billion
- **AUM Not Yet Paying Fees** totaled $18.2 billion, reflecting expected annual management fees of approximately $251 million once deployed
- **Direct Lending Gross Returns**[1] of 3.1% for 3Q'25 and 13.2% over the last twelve months ended 3Q'25
- **Alternative Credit Gross Returns**[1] of 3.9% for 3Q'25 and 15.9% over the last twelve months ended 3Q'25

\*                              \*                              \*

| (dollars in thousands, except per share data) | Quarter Ended | | | Last Twelve Months | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 3Q'25 | 3Q'24 | % Change | 3Q'25 | 3Q'24 | % Change |
| **GAAP Revenues** | | | | | | |
| Credit (including Part I Fees of $149,173, $138,300, $552,392 and $493,551) | $ 401,605 | $ 325,210 | 23% | $ 1,474,268 | $ 1,133,606 | 30% |
| Real Assets | 91,840 | 49,705 | 85% | 361,218 | 166,227 | 117% |
| GP Strategic Capital (including Part I Fees of $1,268, $2,376, $6,150 and $8,651) | 152,210 | 148,394 | 3% | 594,827 | 547,706 | 9% |
| Management Fees, Net | 645,655 | 523,309 | 23% | 2,430,313 | 1,847,539 | 32% |
| Administrative, Transaction and Other Fees | 82,147 | 77,289 | 6% | 303,568 | 304,934 | —% |
| Performance Revenues | 188 | 280 | (33%) | 12,062 | 5,628 | 114% |
| **GAAP Revenues** | **727,990** | **600,878** | **21%** | **2,745,943** | **2,158,101** | **27%** |

\*                                    \*                                    \*

| (dollars in thousands, except per share data) | Quarter Ended | | Last Twelve Months | |
| --- | --- | --- | --- | --- |
| | 3Q'25 | 3Q'24 | 3Q'25 | 3Q'24 |
| Income Before Income Taxes | $ 55,321 | $ 112,120 | $ 254,230 | $ 479,461 |
| GAAP Revenues | $ 727,990 | $ 600,878 | $ 2,745,943 | $ 2,158,101 |
| **GAAP Margin** | **7.6 %** | **18.7 %** | **9.3 %** | **22.2 %** |
| | | | | |
| Fee-Related Earnings Before Noncontrolling Interests | $ 392,247 | $ 337,223 | $ 1,466,056 | $ 1,223,824 |
| FRE Revenues | $ 686,997 | $ 568,327 | $ 2,548,921 | $ 2,043,690 |
| **FRE Margin** | **57.1 %** | **59.3 %** | **57.5 %** | **59.9 %** |

44.     On the same date, the Company hosted an earnings call to discuss its financial results. As part of his introductory remarks, the Company's Co-CEO, Defendant Lipschultz, assured investors the Company continued to see "*no signs of meaningful stress.*" Yet during the earnings call, analysts pushed management to explain how it expects to absorb the sizable originations the Company granted in the quarter, with one analyst form TD Cowen remarking "despite the strong macro dynamics, *the fund performance has been pretty weak two quarters in a row.*" In response, the Company's CFO, Defendant Kirshenbaum, assured investors that this was only "*short-term noise*" as "*[t]his quarter, we saw some mark-to-market on swaps that we have around debt that's in place.*" Defendant Lipschultz further assured investors the Company's financial results were merely "an accounting matter, the swap itself gets marked for accounting purposes unrelated to the fact that really, it's just serving to create this fixed income stream. So that is just an accounting quirk." Specifically during the earnings call, the following statements were made, in relevant part:

**Marc S. Lipschultz**

As we have highlighted in previous earnings calls and continue to call out, the health of our credit portfolio remains excellent with an average annual realized loss of just 13 basis points and **no signs of meaningful stress.** In direct lending, the modest level of nonaccruals we have seen are not thematic in nature, and there's not been an uptick in our watch list levels.

*                         *                         *

**Analyst, TD Cowen, Research Division:**

I wish it was a day we could ask more than one. Maybe sticking with the digital story. I was wondering if you could **help us understand how quickly you might be able to absorb the most recent flagship fundraising given the size of the pipeline?** And then secondarily, **despite the strong macro dynamics, the fund performance has been pretty weak two quarters in a row.** I was wondering if you can help us unpack why that's the case? And would that be a hindrance to drive growth from here?

*                         *                         *

**Alan Kirshenbaum**

Sure. Thanks, Bill. **This quarter, we saw some mark-to-market on swaps that we have around debt that's in place.** So when we look at this, we see these are very long-term projects. When you look at the underlying performance of the data centers, they are very strong. And I'll tell you, on average, across our digital infrastructure funds, Fund I, II and III, we have IRRs in the high teens. So we're experiencing great IRRs for our investors. **This is short-term noise.**

**Marc S. Lipschultz**

Yes. And just to frame that in a way that will be apparent to everyone I'm sure it's already apparent to you. These are very long-dated leases with rent escalators, not to be lost by the way, that escalator is very powerful over time. But to match, we will -- we swap debt in many cases against them. So we've locked in our returns and our returns are outstanding. **But as an accounting matter, the swap itself gets marked for accounting purposes unrelated to the fact that really, it's just serving to create this fixed income stream. So that is just an accounting quirk.**

45.      On this news, the Company's share price fell $0.70 per share, or 4.23%, or to close

at $15.86 per share on October 30, 2025, on unusually heavy trading volume.

46.      On November 5, 2025, after the market closed, OBDC and OBDC II announced

they had entered into a definitive merger agreement. The announcement revealed "**OBDC II does**

**not anticipate conducting additional tender offers prior to the merger.**" The announcement

27

alleged the "proposed merger **enhances liquidity** for shareholders of the combined company." The announcement also revealed that, under the terms of the proposed merger, "shareholders of OBDC II will receive newly issued whole shares of OBDC for each share of OBDC II based on the exchange ratio determined prior to closing." "The exchange ratio will be calculated based upon (i) the NAV [net asset value] per share of OBDC and OBDC II, each determined before merger close and **(ii) the market price of OBDC common stock ("OBDC Price") before merger close.**" Specifically, the announcement stated as follows, in relevant part:

> Blue Owl Capital Corporation (NYSE: OBDC) ("OBDC") and Blue Owl Capital Corporation II ("OBDC II") announced today that they have entered into a **definitive merger agreement, with OBDC as the surviving company,** subject to certain shareholder approvals of OBDC II and other customary closing conditions. Following the recommendation of each of their special committees, the boards of directors of both OBDC and OBDC II have unanimously approved the transaction.

>     *              *              *

> **Enhances Shareholder Liquidity** and Potential for Broader Investor Participation – The proposed merger enhances liquidity for shareholders of the combined company and may improve the ability to attract a broader, more diverse investor base.

>     *              *              *

> Under the terms of the proposed merger, shareholders of **OBDC II will receive newly issued whole shares of OBDC for each share of OBDC II based on the exchange ratio determined prior to closing.** No fractional shares will be issued as a result of the merger. In lieu of issuing fractional shares, OBDC will directly pay an amount in cash equal to the amount calculated as a result of the exchange ratio to each OBDC II stockholder who would otherwise have been entitled to a fraction of a share. **The exchange ratio will be calculated based upon (i) the NAV per share of OBDC and OBDC II, each determined before merger close and (ii) the market price of OBDC common stock ("OBDC Price") before merger close.**

>     *              *              *

> Additionally, **OBDC II does not anticipate conducting additional tender offers prior to the merger**.

47.     On this news, the Company's share price fell $0.74 per share or 4.72%, to close at $14.95 per share on November 6, 2025, on unusually heavy trading volume.

48.     On Sunday, November 16, 2025, FINANCIAL TIMES published an article entitled "Blue Owl private credit fund merger leaves some investors facing 20% hit." The article provided an interview with the CFO of OBDC, Jonathan Lamm, revealing that ***"If shareholders were to vote down the deal,*** [Lamm] ***acknowledged that Blue Owl Capital Corporation II might be forced to limit redemptions."*** The article further reported details of two critical aspects of the merger. First, OBDC II investors would indeed be blocked from making any redemptions until the merger completes in 2026. Second, as part of the merger, OBDC II shareholders would see the value of their investments fall by about 20 per cent. Investors in OBDC II would see their investments fall due to the terms of the exchange, under which they would receive OBDC shares based, in part, on OBDC's market price, which trades at a discount of about 20% to the stated value of its assets. The article affirmed Lamm "conceded in an interview with the Financial Times that at current prices, the ***investors in Blue Owl Capital Corporation II could take a potential haircut on their investments***." The article continued, disclosing "***the trading price of OBDC, Lamm added, had been hit by souring sentiment on private credit markets***[.]" Specifically, FINANCIAL TIMES reported as follows, in relevant part:

> Blue Owl has blocked redemptions in one of its earliest private credit funds as it merges with a larger vehicle overseen by the asset manager in a deal that could leave investors with large losses.
>
> Investors in the fund being acquired could face losses of about 20 per cent on their holdings and will not be able to withdraw their money in advance of the merger, according to a press release.
>
> The deal underscores the risks that retail investors have taken in pouring hundreds of billions of dollars into private debt funds carrying limited liquidity rights. The fund merger also comes as scrutiny builds on the valuations and returns of private credit funds, which have caused publicly listed debt funds, called BDCs, to sell off and trade at steep discounts to the stated value of their assets.

Earlier this month, Blue Owl told its shareholders that it planned to merge its Blue Owl Capital Corporation II fund, which has $1bn in assets and was one of the first private debt funds targeting wealthy individual investors, with its OBDC fund, which has $17bn in assets.

Blue Owl Capital Corporation II investors are being asked to exchange their shares in the private fund for shares in OBDC at the stated net asset value of both funds. However, OBDC trades on public markets at a discount of about 20 per cent to the stated value of its assets. Blue Owl Capital Corporation II, meanwhile, is not publicly traded and instead offers investors the ability to redeem cash every quarter at the fund's stated value.

*      *      *

***The merger of the two funds comes as redemptions in Blue Owl Capital Corporation II have climbed this year to a level where it would eventually be forced to restrict investor redemptions***.

Investors in Blue Owl Capital Corporation II have pulled $150mn from the fund through the first nine months of this year, a 20 per cent increase from this time last year, according to securities filings. Redemptions in the third quarter nearly doubled to $60mn, or 6 per cent of its NAV.

***Jonathan Lamm, chief financial officer of OBDC, conceded in an interview with the Financial Times that at current prices, the investors in Blue Owl Capital Corporation II could take a potential haircut on their investments.***

*      *      *

***The trading price of OBDC, Lamm added, had been hit by souring sentiment on private credit markets*** that was not backed up by the performance of Blue Owl's underlying loans.

*      *      *

"There's no doubt that this is a no-brainer transaction at 95 cents," said Lamm of the newer merger. ***If shareholders were to vote down the deal, he acknowledged that Blue Owl Capital Corporation II might be forced to limit redemptions.***

49.    On this news, the Company's share price fell $0.85 per share, or 5.8%, to close at $13.77 per share on November 17, 2025, on unusually heavy trading volume.

50.    After the class period ended, on November 19, 2025, OBDC and OBDC II announced they terminated the proposed merger, citing "current market conditions," but "with

30

plans to reevaluate alternatives in the future." Subject to board approval, OBDC II stated it "plans to reinstate the tender program in Q1 2026."

## CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Blue Owl securities between February 6, 2025 and November 16, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

52.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Blue Owl's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Blue Owl shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Blue Owl or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Blue Owl; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

57.     The market for Blue Owl's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Blue Owl's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Blue Owl's securities relying upon the integrity of the market price of the Company's securities and market information relating to Blue Owl, and have been damaged thereby.

58.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Blue Owl's securities, by publicly issuing false and/or misleading statements

and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false, and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Blue Owl's business, operations, and prospects as alleged herein.

59.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Blue Owl's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

60.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

61.    During the Class Period, Plaintiff and the Class purchased Blue Owl's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

62.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Blue Owl, their control over, and/or receipt and/or modification of Blue Owl's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Blue Owl, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

63.    The market for Blue Owl's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Blue Owl's securities traded at artificially inflated prices during the Class Period.  On February 5, 2025, the Company's share price closed at a Class Period high of $24.95 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Blue Owl's securities and market information relating to Blue Owl, and have been damaged thereby.

64.    During the Class Period, the artificial inflation of Blue Owl's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about Blue Owl's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Blue Owl and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

65.    At all relevant times, the market for Blue Owl's securities was an efficient market for the following reasons, among others:

(a)    Blue Owl shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Blue Owl filed periodic public reports with the SEC and/or the NYSE;

(c)    Blue Owl regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Blue Owl was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

66.    As a result of the foregoing, the market for Blue Owl's securities promptly digested current information regarding Blue Owl from all publicly available sources and reflected such

information in Blue Owl's share price. Under these circumstances, all purchasers of Blue Owl's securities during the Class Period suffered similar injury through their purchase of Blue Owl's securities at artificially inflated prices and a presumption of reliance applies.

67.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Blue Owl who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

69.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Blue Owl's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

71.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Blue Owl's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

72.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Blue Owl's financial well-being and prospects, as specified herein.

73.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Blue Owl's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Blue Owl and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

74.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

75.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Blue Owl's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Blue Owl's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Blue Owl's securities during the Class Period at artificially high prices and were damaged thereby.

77.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems

that Blue Owl was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Blue Owl securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

80.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

81.     Individual Defendants acted as controlling persons of Blue Owl within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements

alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.    As set forth above, Blue Owl and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:   December 3, 2025

*/s/ Rebecca Dawson*

**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Alexander Goldman*

## SWORN CERTIFICATION OF PLAINTIFF
## BLUE OWL CAPITAL INC. (OWL) SECURITIES LITIGATION

I, Alexander Goldman, certify that:

1.     I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2.     I did not purchase the Blue Owl Capital Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.     My transactions in Blue Owl Capital Inc. securities during the period set forth in the Complaint are as follows:

       (See attached transactions)

5.     I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6.     I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


| 11/21/2025 | |
| --- | --- |
| Date | Alexander Goldman |

**Alexander Goldman's Transactions in Blue Owl Capital Inc. (OWL)**
**Common Stock**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 3/3/2025 | Bought | 200 | $21.810 |
| 3/14/2025 | Bought | 104 | $19.220 |
| 3/17/2025 | Bought | 75 | $19.760 |
| 4/3/2025 | Bought | 130 | $17.829 |
| 4/3/2025 | Sold | -9 | $17.820 |
| 5/2/2025 | Bought | 168 | $18.150 |
| 8/20/2025 | Bought | 100 | $18.579 |
| 8/25/2025 | Bought | 42 | $18.749 |
| 8/27/2025 | Bought | 55 | $18.689 |
| 8/28/2025 | Bought | 54 | $18.829 |
| 9/5/2025 | Bought | 113 | $17.768 |
| 9/8/2025 | Bought | 56 | $17.855 |
| 9/24/2025 | Bought | 25 | $18.390 |
| 9/25/2025 | Bought | 40 | $17.219 |
| 9/26/2025 | Bought | 50 | $17.688 |
| 9/30/2025 | Bought | 60 | $16.803 |
| 10/2/2025 | Bought | 44 | $15.810 |
| 10/3/2025 | Bought | 51 | $16.201 |
| 10/30/2025 | Bought | 63 | $15.999 |
| 10/31/2025 | Bought | 1,075 | $15.770 |

**Alexander Goldman's Transactions in Blue Owl Capital Inc. (OWL) Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Price |
|---|---|---|---|---|---|
| 4/3/2025 | Sell to Open | Call | 4/17/2025 / $20 | -5 | $0.180 |
| 5/9/2025 | Sell to Open | Call | 6/20/2025 / $20 | -6 | $0.400 |
| 5/16/2025 | Buy to Close | Call | 6/20/2025 / $20 | 3 | $0.650 |
| 6/9/2025 | Buy to Close | Call | 6/20/2025 / $20 | 3 | $0.250 |
| 7/7/2025 | Sell to Open | Call | 8/15/2025 / $20 | -3 | $0.700 |
| 8/4/2025 | Buy to Close | Call | 8/15/2025 / $20 | 3 | $0.300 |
| 9/30/2025 | Buy to Open | Call | 10/17/2025 / $17 | 1 | $0.550 |
| 10/2/2025 | Sell to Close | Call | 10/17/2025 / $17 | -1 | $0.150 |
| 11/6/2025 | Sell to Open | Call | 11/21/2025 / $19 | -9 | $0.050 |