**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXANDER GOLDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>BLUE OWL CAPITAL INC., DOUGLAS I. OSTROVER, MARC S. LIPSCHULTZ, and ALAN KIRSHENBAUM,<br><br>　　　　　　　Defendants. | Case No. 1:25-cv-10047-JPC-OTW |

**ALEXANDER GOLDMAN'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND <u>APPROVAL OF LEAD COUNSEL</u>**

## I.      INTRODUCTION

Plaintiff Goldman's[1] motion for appointment as lead plaintiff and approval of his selection of counsel (Dkt. No. 18) should be granted because the only movants who claim a larger financial interest (the Nova Scotia Plans) are inadequate to represent the class. Goldman is the *bona fide* movant with the largest financial interest and the Nova Scotia Plans do not contest that he is adequate to represent the class. Accordingly, Goldman should be appointed as lead plaintiff and his selection of counsel should be approved.

## II.     THE NOVA SCOTIA PLANS SHOULD BE DISQUALIFIED BECAUSE THEY FAILED TO DISCLOSE THAT THEY INVESTED IN BLUE OWL BONDS AND RECEIVED INTEREST PAYMENTS DURING THE CLASS PERIOD

While the Nova Scotia Plans claim to have a larger loss than Goldman, the Nova Scotia Plans should be disqualified from consideration because they are inadequate. The Nova Scotia Plans admitted in their response letters to Goldman that they received more than $32,000 in interest payments on their Blue Owl investments during the class period. *See* Dkt. No. 29-4, at 2.

The Nova Scotia Plans have acknowledged these gains in letters sent to Goldman's counsel, but have still not acknowledged them on the record. The Nova Scotia Plans filed a revised loss analysis to correct *other* false claims regarding their transactions and loss in their initial filing. *See* Dkt. No. 28 at 8 n.3 ("The loss chart (ECF 24-1) submitted on the Nova Scotia Plans' behalf incorrectly characterized two post-Class-Period transactions on January 2, 2026 as stock sales when, instead, they were intra-account transfers."). However, the Nova Scotia Plans have *still* not acknowledged or incorporated their class period Blue Owl interest payments into their loss analysis.

---

[1] All capitalized terms herein are as defined in Goldman's opposition memorandum (Dkt. No. 27).

The Nova Scotia Plans' repeated failure to accurately report their transactions and identify and incorporate their gains into their loss analysis is disqualifying. *See Williams v. Block.One*, 2020 WL 4505569, at *1 (S.D.N.Y. Aug. 4, 2020) (rejecting lead plaintiff movants that "failed to submit all of [their] trading data" because without complete data, the court could not properly evaluate the movants' lead plaintiff motions); *Micholle v. Ophthotech Corporation*, 2018 WL 1307285, at *9 (S.D.N.Y. Mar. 13, 2018) (holding date and pricing errors in a movant's submission "militate against appointment and render him inadequate to serve as lead plaintiff").

**III.    THE NOVA SCOTIA PLANS SHOULD BE DISQUALIFIED BECAUSE THEY HAVE REFUSED TO CLARIFY WHETHER THEY HAD AN INVESTMENT OR CONTRACTUAL RELATIONSHIP WITH BLUE OWL DURING THE CLASS PERIOD**

The Nova Scotia Plans have had more than two weeks to either clarify the extent of the Nova Scotia Plans' and NS Pension's relationship with Blue Owl, or deny that any such relationships existed. They have done neither.

On February 9, 2026—15 days prior to the filing of this reply—Goldman sent a letter to counsel for the Nova Scotia Plans and pointed out that Blue Owl's most recent annual report states that the company's "investor base includes a diversified mix of institutional investors, including prominent public and private pension funds" which may include the Nova Scotia Plans or NS Pension. *See* Dkt No. 29-1 at 2. As such, Goldman asked whether the Nova Scotia Plans or NS Pension "currently have, or . . . ever had, any contractual, advisory, service, or other business relationship with Blue Owl Capital Inc. or its related entities." *Id.* The letter also asked whether "the Nova Scotia Plans made any direct or indirect investment" in "Blue Owl Capital Inc. or its related entities." *Id.* The letter also asked the Nova Scotia Plans to identify the "specific individuals (by name, title, and role) that authorized, executed, or oversaw the purchase and sales" of Blue Owl stock, on behalf of the Nova Scotia Plans and asked whether any of them "have, or . . . ever

had, any contractual, advisory, service, or other business relationship" with Blue Owl or its related

entities. *Id.* at 2.

On February 13, 2026, the Friday before opposition memoranda were due, and four days

after receiving Goldman's letter, The Nova Scotia Plans provided a three sentence substantive

response to Goldman's questions, stating:

> Neither [the Nova Scotia Plans], nor NS Pension, ***have*** any contractual relationship
> with Blue Owl Capital, Inc. During the Class Period, PSSP and TPP purchased only
> the stock of Blue Owl Capital, Inc. (NYSE:OWL), through an outside investment
> manager acting on fully delegated investment authority. ***Before the Class Period,***
> ***[the Nova Scotia Plans] each purchased a bond issued by Blue Owl Finance LLC,***
> ***an indirect subsidiary of Blue Owl Capital, Inc., which they held throughout the***
> ***Class Period***.

Dkt. No. 29-2 (emphasis added). Notably, the Nova Scotia Plans disclosed for the first time that

they did in fact hold other Blue Owl investments (bonds) during the class period—without

disclosing, as later discovered by Goldman, that they both received substantial interest payments

on those bonds during the class period. Moreover, while the Nova Scotia Plans stated that they

***currently*** do not have any other contractual relationship with Blue Owl, they did not indicate

whether they had such a relationship during the class period in this action. The Nova Scotia Plans

also declined to identify who actually executed the transaction on behalf of the Nova Scotia Plans,

or whether those individuals had any potentially disqualifying relationships with Blue Owl.

In response to the Nova Scotia Plans' revelations that they held Blue Owl bonds during the

class period, and their apparent unwillingness to state whether the Nova Scotia Plans had a

relationship with Blue Owl during the class period, Goldman sent a letter requesting clarification.

*See* Dkt. No. 29-3. This letter was sent on February 13, 2026, the very same day Goldman received

the Nova Scotia Plans response letter. Goldman requested that the Nova Scotia Plans clarify three

points:

1.      Whether the Nova Scotia Plans or NS Pension have ever (including during the class period) had a contractual relationship with Blue Owl, or any related entities (including OBDC and OBDC II identified in the complaint in this action);

2.      Whether the Nova Scotia Plans purchase the securities of any Blue Owl related entities before or during the class period; and

3.      The details regarding the Nova Scotia Plans' Blue Owl bond purchase, including the interest or principal payments (if any).

*See* Dkt. No. 29-3.

The Nova Scotia Plans responded by letter at 7:00 p.m. Eastern Time on February 17, 2026, the day Goldman's opposition memorandum was due. *See* Dkt. No. 29-4. Despite the response letter being three pages long, the Nova Scotia Plans still did not state whether Nova Scotia Plans or NS Pension have ever (including during the class period) had a contractual relationship with Blue Owl, nor whether the Nova Scotia Plans purchased the securities of any Blue Owl related entities during the class period.

While the Nova Scotia Plans objected to Goldman's request for information on the basis that "what two large pension funds have 'ever' done, divorced from the Class Period at issue in this lawsuit" is overbroad (*see* Dkt. No. 29-4 at 3), the Nova Scotia Plans have ***still*** not answered Goldman's questions regarding the Nova Scotia Plans' relationship with Blue Owl ***during the class period.*** Moreover, while the Nova Scotia plans twice referred to Goldman's questions and requests for clarification as a "fishing expedition" (*see id.*, pp. 1-2), Goldman's inquiry is reasonable and in fact led to the Nova Scotia Plans admitting that "During the Class Period, [the Nova Scotia Plans] both received two coupon interest payments" during the class period—one

4

receiving "$9,375 on or about April 18, 2025 and October 18, 2025" and the other receiving "$7,031.25 on those same dates."[2]

The Nova Scotia Plans opposition memorandum (Dkt. No. 28) does not provide any clarity regarding the Nova Scotia Plans' and NS Pension's relationship with Blue Owl during the class period. In fact, the Nova Scotia Plans did not even disclose that they received interest payments on their other Blue Owl investments during the class period.

Despite the Nova Scotia Plans' two response letters and one opposition memorandum, the Nova Scotia Plans' and NS Pension's relationship with Blue Owl during the class period is still unclear. One of two things is likely happening. Either counsel for the Nova Scotia Plans has the relevant information and is refusing to disclose it, or counsel for the Nova Scotia Plans has been unable to retrieve the relevant information from the Nova Scotia Plans in the two (plus) weeks since Goldman requested it. In either case the Nova Scotia Plans are inadequate and should be disqualified.

The class should not be saddled with lead plaintiffs that are unwilling or unable at the outset to disclaim any contractual or other undisclosed investment interest in the defendant company. Defendants will certainly dig into this issue at later stages of the litigation if the Nova Scotia Plans are appointed as lead plaintiff. The mere fact that defenses related to this issue will become a distraction at later stages of the litigation is sufficient to disqualify the Nova Scotia Plans now. *See*

---

[2] Counsel for the Nova Scotia Plans also asked whether Goldman "a Canadian CPA, has any knowledge that you are questioning the suitability of [the Nova Scotia Plans], two of the largest, most well-managed pension funds in the Province of Nova Scotia serving public service employees and teachers, to oversee this litigation?" *id.*, p. 3. Yes, Goldman is aware. In fact, Goldman has been looking out for investors interests from the start by filing this action, and is looking out for investors interests now by trying to determine whether the Nova Scotia Plans are subject unique defenses that will later derail this litigation. The Nova Scotia Plans' status does not insulate them from the adequacy requirements of the PSLRA.

*In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2020 WL 5548856, at \*7 (S.D.N.Y. Sept. 16, 2020) (to disqualify a movant, "the Court need not conclude that the defense is likely to or will succeed," the "potential that the presumptively most adequate lead plaintiff will be subject to unique defenses" is sufficient) (citations omitted); *see also Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 123 (S.D.N.Y. 2001) ("When a defense that is unique to a class representative threatens to dominate or even interfere with that plaintiff's ability to press the claims common to the class, then that threat must be analyzed with care."). As such, the Nova Scotia Plans should be disqualified.

## IV.    IF THE COURT DETERMINES THE RECORD IS INSUFFICIENT TO DISQUALIFY THE NOVA SCOTIA PLANS, DISCOVERY SHOULD BE GRANTED

As illustrated above, there are many outstanding questions that bear on the Nova Scotia Plans' and NS Pension's adequacy. Any relationship between the Nova Scotia Plans or NS Pension and Blue Owl can give rise to conflicts of interest or give the Nova Scotia Plans access to non-public information which would render them inadequate. Moreover, any such relationship (including the Nova Scotia Plans' confirmed investments in Blue Owl bonds) is likely governed by written agreements that define (and/or limit) the Nova Scotia Plans' and NS Pension's litigation rights with respect to Blue Owl in the event of a dispute. Such issues should be discovered and resolved now, rather than at class certification or summary judgment where they could hurt the interests of the class. These facts constitute, at least, a "reasonable basis" for discovery. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iv); *Broadfoot v. Barrick Gold Corp.*, 2017 WL 3738444, at \*1 (S.D.N.Y. Aug. 9, 2017) (granting limited discovery where "there exists a potential that [a movant] is in a unique position that would defeat typicality and adequacy").

Moreover, counsel for Goldman and counsel for the Nova Scotia Plans would be able to conduct discovery quickly and efficiently. Both were very recently involved in another action (*Coan v. B. Riley Financial, Inc.*) where limited discovery was granted, and the movant with the

6

largest loss was disqualified because, among other things, a written agreement was uncovered that contained "purported limitations" on the movant's rights. *In re B. Riley Fin., Inc., Sec. Lit.*, 2025 WL 2701764, at \*3 (C.D. Cal. Feb. 4, 2025) ("[T]he [Securities Purchase Agreement's] applicability in this matter . . . may potentially distract the litigation from the central class issues.").

In *B. Riley*, three lead plaintiff applicants moved for appointment. One movant, the Chin Trust, suffered losses of almost $4 million, and the other two movants lost just $8,514 and $13,541, respectively. *See Coan v. B. Riley Fin., Inc.*, 2024 WL 5301847, at \*3 (C.D. Cal. Aug. 8, 2024). Counsel for Goldman and counsel for the Nova Scotia Plans here represented the two smaller movants in the *B. Riley* action. The two smaller movants argued that the Chin Trust "may have had access to non-public information" or other concerning relationships with the defendant company. *See Coan*, 2024 WL 5301847, at \*6, \*7 n.4. And while the Chin Trust claimed that it "did not discuss non-public information" with B. Riley management, the Court found that the smaller movants "raised questions sufficient to call the truth of these assertions into doubt," and granted discovery. *See Coan*, 2024 WL 5301847, at \*7 n.4.

In discovery, the two smaller movants discovered that the Chin Trust had a contractual relationship with B. Riley—a Securities Purchase Agreement ("SPA"). *See In re B. Riley Fin., Inc.*, 2025 WL 2701764, at \*2 (C.D. Cal. Feb. 4, 2025). The court found, among other things, that the movants' dispute over the provisions of the SPA "demonstrates the possibility" that the Chin Trust "may face unique defenses raised by Defendant" and disqualified the Chin Trust. *See id.*, at \*3. The court also found that the Chin Trust's communications with the defendant company "present potential unique defenses that speak to the [Chin Trust's] reliance on public misrepresentations." *See id.*, at \*4. The *B. Riley* court protected the class and avoided serious problems at class certification and summary judgment by permitting limited discovery at the

outset. Likewise, if the Court determines that the record here is insufficient to disqualify the Nova Scotia Plans, but that discovery may yield information relevant to the Nova Scotia Plans' adequacy, the Court should grant Goodman's request for discovery.

## V.    GOLDMAN SHOULD BE APPOINTED AS LEAD PLAINTIFF

Since the Nova Scotia Plans should be disqualified as inadequate, Goldman is the remaining *bona fide* movant with the largest financial interest. Since Goldman also filed a timely motion and is adequate and typical of the class, he is the presumptively most adequate plaintiff to be appointed as lead plaintiff.

The Nova Scotia Plans have not attempted to rebut the presumption by showing (or even suggesting) that Goldman is inadequate or subject to unique defenses in their opposition memorandum. Indeed, Goldman is more than adequate. Goldman is a tax accountant, has a CPA designation from CPA Canada, and has been managing his investments for approximately nine years. *See* Dkt. No. 19 at 9. Since Goldman is presumptively the most adequate plaintiff, and the presumption has not been rebutted, Goldman should be appointed as lead plaintiff.

## VI.    CONCLUSION

For the foregoing reasons, Goldman respectfully requests that the Court enter an Order: (1) appointing Goldman as lead plaintiff; (2) approving Goldman's selection of Glancy Prongay Wolke & Rotter LLP as lead counsel; and (3) denying the Nova Scotia Plans' lead plaintiff motion.

Respectfully submitted,

DATED: February 24, 2026  **GLANCY PRONGAY WOLKE & ROTTER LLP**

By: */s/ Gregory B. Linkh*
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
   clinehan@glancylaw.com
   prajesh@glancnylaw.com

*Counsel for Plaintiff Alexander Goldman and Proposed
Lead Counsel for the Class*

9

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Alexander Goldman certifies that this brief contains 2,551 words, which complies with the word limit of L.R. 7.1(c).

*/s/ Gregory B. Linkh*
Gregory B. Linkh

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 24, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 24, 2026, at New York, New York.

_/s/ Gregory B. Linkh_
Gregory B. Linkh